# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LEE ANTHONY BROWN,**

                **Plaintiff,**

 v.                                                   Case No. 22-CV-018

**EMIL TONEY,** *et al.*,

                **Defendants.**

---

## DECISION AND ORDER

---

Plaintiff Lee Anthony Brown, who is representing himself and confined at Oshkosh Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Brown was allowed to proceed on a Fourteenth Amendment due process claim against defendants Emil Toney, Hans Kuster, and Eric Norman for allegedly transferring him to a different institution, keeping him in temporary lockup (TLU), and withholding his property. The parties filed cross-motions for summary judgment. (ECF Nos. 22, 29.) They also have consented to the jurisdiction of a magistrate judge. (ECF Nos. 13, 14.)

## FACTS

On October 31, 2020[1], Brown "was subjected to being taken out of his bed [at Redgranite Correctional Institution (RGCI)] by masked men with guns and placed on a bus [to Oshkosh Correctional Institution] with no clothes other than a pair of shorts

---

[1] Brown states the transfer happened on October 30, 2020, but both the defendants' proposed findings of fact and the documents on the record indicate that it actually occurred on October 31, 2020, so that is the date the court will use.

and slippers." (ECF No. 36 at 3.) It is undisputed that Brown was transferred to Oshkosh because RGCI officials believed that on October 30, 2020, he was part of "a large, organized number of defiant inmates who refused to comply with staff directives to return to their cell and lock-in from the dayroom." (ECF No. 31, ¶¶ 6-7.) RGCI personnel (who are not defendants) made the decision to transfer Brown to Oshkosh. (*Id.*, ¶ 8.) Defendant Emil Toney, the Security Director at Oshkosh, agreed to accept prisoners who had been involved in the incident at RGCI. (*Id.*, ¶¶ 2, 8.)

When Brown arrived at Oshkosh he was placed in the Restrictive Housing Unit (RHU) on TLU status. (ECF No. 31, ¶ 9.) TLU status "is a temporary non-punitive segregated status" that is not considered a "disciplinary penalty" and "allows an inmate to be separated from the general population pending further administrative action," which is usually an investigation into the prisoner's alleged wrongdoing. (*Id.*, ¶ 10.) Because the transfer took place during the height of the COVID-19 pandemic, Brown was placed in a quarantine cell within the RHU, where for a fourteen-day period he was confined to his cell. (*Id.*, ¶ 12.)

Brown asserts that his transfer took place "without notice written or oral nor a reclassification hearing." (ECF No. 36 at 3.) On November 4, 2020, Brown submitted an "Interview/Information Request" to Toney inquiring about his transfer and informing Toney he did not receive a conduct report or TLU order. (ECF No. 31, ¶ 13.) Toney then spoke with the Security Director at RGCI (unnamed in the record) to get information to respond to Brown's Interview/Information Request. (*Id.*, ¶ 14.)

After speaking to the RGCI Security Director, Toney responded to Brown, telling him that he was transferred to Oshkosh for participating in the October 30 disturbance and that RCGI would be issuing him a conduct report. (ECF No. 31, ¶ 14.) Toney also learned that Brown had not received a Form DOC-67 Notice of Inmate Placement in Temporary Lockup, which is typically served on a prisoner when placed on TLU status. (*Id.*, ¶ 15-16.) Toney asked defendant Kuster to complete the DOC-67 . (*Id.*, ¶ 17.) On November 6, 2020, Kuster prepared the form and served it on Brown, telling Brown he was receiving it because of his alleged participation in the October 30 incident at RGCI. (*Id.*, ¶¶ 18-19.) Brown was given an opportunity to make a statement regarding his placement. (*Id.*, ¶ 20.) Brown said he had "no comment" and refused to sign the form. (*Id.*)

On November 20, 2020, RGCI issued Conduct Report 133913 to Brown for disobeying orders, inciting a disturbance, and participating in the October 30 incident. (ECF No. 31, ¶ 21.) Brown notes that he received the report 21 days after he was placed in TLU without written or oral notice or a reclassification hearing. (ECF No. 36 at 3.) Brown also states that the conduct report contained false allegations, and he maintains that he did not participate in the October 30 incident. (*Id.* at 4.) Kuster delivered the conduct report to Brown and explained to him the "Uncontested Major Process," meaning that, if Brown decided not to contest the conduct report, he could begin his disciplinary separation sooner. (ECF No. 31, ¶¶ 23-24.) A prisoner who chooses to contest the conduct report has the opportunity for a hearing. (*Id.*, ¶ 28.)

3

Brown chose to contest the conduct report and submitted an "Inmate's Request for Attendance of Witness/Evidence." (ECF No. 31, ¶ 29.) Non-defendant Nikki Schewbke reviewed Brown's request and denied him the opportunity to call two witnesses—Dominque Thomas and Correctional Officer Harley. (*Id.*, ¶ 30.) Brown states that he was also denied the opportunity to present video evidence, although he does not say who denied him this opportunity. (ECF No. 36 at 5.) None of the named defendants were involved in the decision to deny witnesses or evidence. (ECF No. 31, ¶ 31.)

Brown's hearing took place on November 30, 2020. (ECF No. 31, ¶ 32.) Defendant Norman was the hearing officer and non-defendant Colleen Janikowski was the hearing committee member. (*Id.*) Brown attended the hearing in person. (*Id.*) Norman states that he and Janikowski "considered the reporting officers' narrative in Conduct Report 133913, video of the incident, and testimony by reporting staff members and witnesses" and determined that Brown did not lock into his cell and ignored directives. (*Id.*, ¶ 33.) Norman and Janikowski found Brown guilty of disobeying orders and participating in the October 30 incident but found him not guilty of inciting a disturbance. (*Id.*, ¶ 34.) Based on the recommendation from RGCI staff, Brown received a disposition of 120 days in disciplinary segregation. (*Id.,* ¶35.)

Brown appealed that decision. (ECF No. 31, ¶ 37.) On December 17, 2020, non-defendant Deputy Warden Zanon returned the case to Norman "for correction of procedure because reasons for denial of witnesses was not sufficiently documented." (*Id.*, ¶ 38.) Although Brown was given an opportunity to present evidence from

4

Thomas and Harley, he indicated that he no longer wanted Thomas to testify. (*Id.*, ¶ 39.) Brown provided questions that were given to Harley, who submitted a response. (*Id.*)

Norman and Janikowski then reconsidered the evidence along with the new evidence from Harley. (ECF No. 31, ¶ 40.) They again found Brown guilty of participating in the October 30 disturbance and disobeying orders. (*Id.*) On January 6, 2021, Norman delivered a revised "Major Disciplinary Hearing" document to Brown that reflected the new findings. (*Id.*, ¶ 41.) On January 28, 2021, Brown was released early from RHU on Toney's recommendation for good behavior, serving 59 days of his 120-day disposition. (*Id.*, ¶ 42.)

On March 22, 2021, Brown filed Inmate Complaint # 2021-1241 wherein he complained that he was not aware that a rehearing had taken place. (ECF. 31, ¶ 43.) The Corrections Complaint Examiner (not a defendant) decided to give Brown a formal rehearing. (*Id.*) On May 5, 2021, Norman and Janikowski conducted a formal rehearing that considered the new evidence. (*Id.*, ¶ 44.) Brown was again found guilty of participating in a disturbance and of disobeying orders. (*Id.*)

Brown states that, while he was in TLU and disciplinary segregation in RHU, he was "in living conditions that fall short of the [Department of Corrections] standard." (ECF No. 36 at 6.) Specifically, he states that, while he was housed in the "covid range" of RHU for approximately 44 days, he was not allowed to clean his cell or have recreation time. (*Id.*) He also was not allowed to have access to the prison law

5

library or to have religious materials. (*Id.*) He also states that he was not allowed personal pictures, hygiene items like shower shoes, and his legal materials. (*Id.*)

The defendants assert that Oshkosh records indicate that Brown visited the law library several times between November 2020 and January 29, 2021, when he was released from RHU. (ECF No. 31, ¶ 55.) He was also allowed to write and receive letters, and records indicate that he made phone calls. (*Id.*, ¶ 59.) The defendants admit that, while Brown was on quarantine status, he was not allowed recreation time and that there were several times during the end of 2020 where recreation time was simply cancelled due to COVID spread. (*Id.*, ¶¶ 61-63.) Oshkosh records indicate that Brown participated in recreation time at least nine times in December 2020 and three times in January 2021. (*Id.*, ¶¶ 63-64.)

The defendants assert that Brown's lack of access to his property was largely caused by RGCI's decision to suddenly transfer him. (ECF No. 31, ¶ 46.) The Oshkosh Inmate Handbook explicitly states that upon transfer there will be a delay in accessing property. (*Id.*, ¶ 48.) When a prisoner is on a temporary hold and has not yet been formally reclassified, personally property will not be transferred until reclassification occurs. (*Id.*) Brown was not reclassified until December 28, 2020, and, because the first of the COVID-19 stimulus checks had recently been issued, the Department of Corrections' property offices were overwhelmed by requests for property orders. (*Id.*, ¶ 49.) Brown's property did not arrive from RGCI to Oshkosh until January 2021, and Brown received his property on January 29, 2021, when he was released early from RHU. (*Id.*, ¶¶ 51-52.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Brown claims that the defendants violated his constitutional rights by placing him in TLU upon his transfer from RGCI and by not allowing him to present witnesses and video evidence at his November 30, 2020 hearing, which lead to his placement in disciplinary segregation in the RHU.

Toney and Kuster were not personally involved in the decision to place Brown in TLU, nor were they involved in the conduct report hearing. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." *Hildebrant v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's," *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir.2009). The decision to place Brown in TLU upon his arrival at Oshkosh was made by RGCI personnel, not the defendants, including Norman.

TLU status is conferred upon a prisoner when there is a pending investigation into conduct that may require discipline. RGCI staff determined that Brown likely participated in the October 30 disturbance. If that placement violated Brown's constitutional rights, it was RGCI staff who violated them. At most Toney and Kuster remedied the apparent due process errors made by RGCI staff when they served the Form DOC-67 on Brown. But fixing the constitutional violations of other state actors does not transfer liability upon Toney and Kuster. There is also no evidence that

8

Norman participated in the decision to place Brown on TLU status. No reasonable factfinder could conclude that Toney, Kuster, or Norman were responsible for Brown's placement on TLU status. To the extent there is a claim against them for that placement, it is dismissed.

There is also no evidence that Toney and Kuster participated in the conduct report hearing that resulted in Brown being placed in segregation or the RHU. Kuster's only role was to deliver the conduct report that RGCI issued and explain to Brown his options on how to proceed. There is no evidence he was responsible for denying the testimony of witnesses or refusing to admit other evidence. There is also no evidence that Toney participated in the issuance of the conduct report or the associated hearing. As such, they cannot be held liable for the Fourteenth Amendment due process claims because no reasonable factfinder could conclude that they participated in the alleged constitutional violations. Summary judgment is granted in their favor.

The only claim that remains is the Fourteenth Amendment claim against Norman for allegedly hampering Brown's ability to present witnesses and evidence at his conduct report hearing and subsequently placing him in disciplinary segregation. The court notes that Norman did not decide that Brown could not call witnesses—that decision was made by non-defendant Nikki Schewbke.

"A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that

9

deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994)). "Whether a prisoner has a liberty interest implicated by special confinement relies on whether the confinement imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To determine whether a plaintiff has a liberty interest, courts "look[] to 'the combined import of the duration of the segregative confinement *and* the conditions endured.'" *Id.* (quoting *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)) (emphasis in original). "Although relatively short terms of segregation rarely give rise to a prisoner's liberty interest, at least in the absence of exceptionally harsh conditions, such an interest *may* arise from a long term of confinement combined with atypical and significant hardships." *Id.* (emphasis in original). The Court of Appeals for the Seventh Circuit has noted that "six months of segregation is not such an extreme term and, standing alone, would not trigger due process rights." *Id.* (quoting *Marion*, 559 F.3d at 698).

Brown argues that he had a liberty interest that the state interfered with because, while he was in COVID quarantine, he was not allowed to clean his cell or leave for recreation time. However, as explained above, his time in COVID quarantine took place while he was on TLU status, and none of the defendants can be held liable for those alleged violations because they did not participate in the decision to place him on TLU status.

10

Thus, the court looks only at his conditions of confinement during his disciplinary segregation. He was in disciplinary segregation for less than two months—59 days. The evidence shows that during that time he had access to recreation time and the law library. He also was able to correspond with friends and family. Because of the COVID pandemic, his movements were undoubtedly more restricted than otherwise would have been the case, but the COVID pandemic raised the bar on what normally would be considered an "atypical and significant hardship." During the pandemic, the ordinary incidents of prison life became much harder for *all* prisoners, with library time, recreation time, and visitor time being significantly restricted. Thus, Brown's limited library time and recreation time do not rise to the level of an atypical and significant hardship.

Brown also argues that he was deprived of his personal property as a result of his transfer, which caused his time in segregation to rise to the level of an atypical and significant hardship. However, again, it appears that due to the COVID pandemic many prisoners in general population were having issues with the property office addressing their property issues. (ECF No. 31, ¶ 49.) Also, it is undisputed that Brown had in his possession hygiene items such as linens, towels, toothpaste, etc. He simply did not have his personal property from RGCI, such as personal photos, legal materials and reading materials. Brown's conditions while in RHU did not rise to the level of an atypical and significant hardship. And his time in RHU on its own did not rise to the level of a constitutional violation.

11

Even if Brown did have a liberty interest with regard to his placement in disciplinary segregation., no reasonable factfinder could conclude that the process he was afforded was constitutionally deficient. Prison disciplinary hearings satisfy procedural due process requirements if a prisoner is provided: (1) written notice of the charge against him twenty four (24) hours prior to the hearing; (2) the right to appear in person before an impartial body; (3) the right to call witnesses and to present physical/documentary evidence; and (4) a written statement of the reasons for the action taken against him. *See Wolff v. McDonnell*, 418 U.S. 539, 563-69 (1974). The decision of the disciplinary hearing board must be supported by "some evidence." *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994).

Brown received advance written notice of the hearing on November 20, 2020. He also appeared in person; he (eventually) had the right to call witnesses and present evidence; and he received a written explanation of the disciplinary action taken against him. Because Brown failed to demonstrate that he had a liberty or property interest that was implicated by Norman's actions or that the process he was afforded was constitutionally deficient, summary judgment is granted in Norman's favor.

## CONCLUSION

For the foregoing reasons the defendants' motion for summary judgment is granted and Brown's motion for summary judgment is denied. The defendants also argued that they were entitled to qualified immunity, but because the court is granting summary judgment in their favor on the merits, it does not need address the

12

qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 29) is **GRANTED.**

**IT IS FURTHER ORDERED** that Brown's motion for summary judgment (ECF No. 22) is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time,

generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 11th day of May, 2023.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge